#24170-a-JKM

**2007 SD 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JONI PACKARD LARSON,            Plaintiff and Appellee,

v.

RICK LARSON,            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JON R. ERICKSON
Judge

\* \* \* \*

RICHARD A. JOHNSON
GREGORY T. BREWERS of
Strange, Farrell & Johnson          Attorneys for plaintiff
Sioux Falls, South Dakota          and appellee.

LEE R. BURD          Attorney for defendant
Sioux Falls, South Dakota          and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 19, 2007

OPINION FILED **05/02/07**

#24170

MEIERHENRY, Justice

[¶1.] Joni Packard Larson (Joni) filed for divorce from her husband, Rick Larson (Rick), citing irreconcilable differences. Rick appeals the trial court's valuation of his business, Larson Cable Trailers, Inc., and Joni's equine business. We affirm.

## FACTS

[¶2.] Joni and Rick began living together in 1991 and were married on April 8, 2000. Rick operated two businesses, which were largely intertwined. Rick made the majority of his income from his 30% interest in Larson Digging, Inc., a family owned construction company that buried fiber optic and power cables. Rick had also recently incorporated Larson Cable Trailers, a company which constructed and sold trailers used to transport fiber optic cables.

[¶3.] At trial, Joni's accountant Paul Thorstenson (Thorstenson) gave his opinion of the value of Rick's business entities including Larson Cable Trailers. Thorstenson valued Larson Cable Trailers at $0 because the business was new and lacked an operating history. Thorstenson characterized the business as growing with solid footing in terms of cash flow. The business, as of March 5, 2005, owed $113,000.00 to Farmers and Merchants Bank (F&M Bank). Thorstenson testified that if the corporation were liquidated, the company's assets were sufficient to pay the debt. Consequently, Thorstenson concluded that the value of the company "cannot be less than zero under any standard of value. . . If this entity was going to be sold, it would be sold for nothing less than zero."

[¶4.] An F&M Bank official testified that on the date of trial Larson Cable Trailers had loans totaling $180,000.00 and that Larson Digging had loans totaling $475,000.00. A number of parties guaranteed the loans. Rick's mother personally guaranteed the loans to Larson Digging, Larson Digging guaranteed the loans to Larson Cable Trailers, and Rick personally guaranteed the loans to both Larson Digging and Larson Cable Trailers.

[¶5.] In 1995 while the couple lived together but before they married, Joni began a business raising, training, breeding and selling horses. The business was not profitable, and Joni often paid for business expenses with money from the couple's joint account. Rick's expert equine appraiser valued the horses as follows: $93,900.00 acquired while living together, $38,850.00 acquired while married, and $78,250.00 foaled while married. His proposed property division included all the horses acquired before and after the marriage.

[¶6.] Joni testified based on her records that the value of the horses they acquired while married was $11,650.00 and the value of horses acquired prior to the marriage was $137,900.00. Her testimony and proposed property division did not separate the horses foaled while married. She proposed that all the horses acquired before the marriage not be included in the marital estate.

[¶7.] The trial court found that "[w]hile Joni's horse business may look good on paper, it is doubtful that it can survive for long without Rick's financial contributions." Based on the evidence, the trial court set the value of the horses as follows: $57,900.00 horses acquired while living together, $28,250.00 horses acquired while married, and $55,250.00 horses foaled while married.

[¶8.] The trial court awarded Rick total assets of $252,079.90 and Joni total net equity of $279,246.00 (assets of $290,290.00 minus debts of $11,044.00). Rick appeals and raises the following issues:

## ISSUES

1. Whether the trial court erred in failing to credit Rick for the corporate debt that he personally guaranteed.

2. Whether the trial court erred in considering Joni's opinion of the value of the horses in arriving at the value of the equine business.

## STANDARD OF REVIEW

[¶9.] "[T]he valuation of property involved in a divorce proceeding will not be overturned unless it is clearly erroneous." Edinger v. Edinger, 2006 SD 103, ¶6, 724 NW2d 852, 854. "'All conflicts in evidence must be resolved in favor of the trial court's findings.'" Priebe v. Priebe, 1996 SD 136, ¶8, 556 NW2d 78, 80 (quoting Grode v. Grode, 1996 SD 15, ¶5, 543 NW2d 795, 799). "The omission of assets which should properly be included as marital property is an abuse of discretion." Midzak v. Midzak, 2005 SD 58, ¶16, 697 NW2d 733, 738 (additional citations and quotations omitted). The trial court's conclusions of law are reviewed under the de novo standard of review. Id. ¶14.

## ANALYSIS

*1. Rick's Personal Guarantees*

[¶10.] Rick argues that the trial court erred by not including the amount of debt of Larson Cable Trailers that he personally guaranteed. Rick does not dispute the trial court's valuation of Larson Cable Trailer's at $0. However, Rick claims

that the trial court abused its discretion when it failed to reduce his total assets by the amount of his personal guarantee, which he believed was $199,604.00.

[¶11.]     Joni argues that Rick's personally guaranteed loan is a contingent liability that was appropriately disregarded for purposes of computing Rick's net assets. This Court has discussed contingent liabilities in the context of divorce cases on prior occasions. In *Wallahan v. Wallahan*, this Court considered whether the trial court erred when it refused to apportion $384,000.00 in contingent liabilities between a husband and wife in a divorce action. 284 NW2d 21, 25-26 (SD 1979). In affirming the trial court, we noted that the husband had "testified that the contingent liabilities [were] extremely remote and his ever being held liable on them [was] highly unlikely." *Id*. at 26. We stated, "'[C]ontingent liabilities that may never be paid or that may be paid only in part need not be deducted in determining net worth.' Speculative contingent liabilities should not be considered in apportioning the parties' assets for purposes of a property division." *Id*. (quoting Wahl v. Wahl, 159 NW2d 651, 659 (Wis 1968)).

[¶12.]     We examined contingent liabilities again in *Hansen v. Hansen*, where we determined that two loans were not speculative or contingent liabilities because both the husband and wife testified that these debts existed and that the husband had made efforts to repay the debts. 302 NW2d 801, 802-03 (SD 1981) (holding that the trial court's finding that the loans were contingent was clearly erroneous). We offered the following explanation of contingent liabilities:

> Generally, something is a contingent liability when it depends upon some future event, which may or may not happen, thereby making it uncertain whether it will ever become a liability. Similarly, the word "speculative" has been found to have varying

> meanings. It is "(s)ometimes ... used as ... a conclusion reached by the faculty or process of intellectual examination, search, and reasoning; sometimes as meaning conjecture, guesswork, and surmise."

*Id*. at 803 (internal citations omitted).

[¶13.] Based on Thorstenson's testimony, Rick's personal guarantee on the loan can fairly be characterized as a contingent liability. In placing a $0 value on Larson Cable Trailers, Thorstenson considered Rick's personal guarantee. Thorstenson testified that notwithstanding the loan, the business would not sell for less than $0. He further stated that if the company were forced into bankruptcy, Rick would not have to pay the loan because "the assets of the company, the inventory and receivables, and the equipment would be very sufficient to repay that bank loan." Thorstenson also testified that at the time of trial, there was "no indication of bankruptcy because [of] the good cash flow coming into [the business] this year. . . . [Larson Cable Trailers] looks like it's on its way to becoming a profitable company."

[¶14.] An F&M bank official testified that Rick had personally guaranteed loans to the two businesses totaling $670,467.35. Larson Cable Trailers' portion of the loan was $180,000.00. In addition, Larson Digging had guaranteed the loan to Larson Cable Trailers making its assets a source of payment if the need arose.

[¶15.] However, there was nothing in the record to indicate that bankruptcy or voluntary dissolution were on the horizon nor was there any evidence that F&M Bank had initiated an action to collect on Rick's personal guarantee. Even if these unlikely events were to occur, evidence indicated that the business assets would cover the loan. Therefore, if the guarantees were enforced, Rick would not be the

only liable party nor would he be responsible for the entire amount.  Accordingly, the trial court's failure to deduct the contingent liability of Rick's personal guarantee from his total assets was not an abuse of discretion.

*2.  Valuation of Joni's Equine Business*

[¶16.]        Rick also argues that the trial court erred when it accepted Joni's valuation of the horses she had raised and sold during their relationship.  Rick argues that the trial court should have accepted the expert testimony of Joan Harmon because (1) Harmon was a disinterested witness and (2) Joni failed to offer "hard evidence" of the value of the horses other than her own personal opinion.

[¶17.]        The fact that Joni was an interested party did not preclude her from offering testimony as to the value of the horses used in her equine business.  "[A] business or property owner is clearly qualified to testify to the value of his business or property."  Behrens v. Wedmore, 2005 SD 79, ¶65, 698 NW2d 555, 580.  Joni had been training, raising, breeding, and selling horses for over twenty years and was qualified to offer an opinion as to their value.

[¶18.]        Rick also argues Joni was required to produce "hard evidence" of the value of the horses other than her own personal opinion.  Schwab v. Schwab, 505 NW2d 752 (SD 1993).  Rick emphasizes the following language in *Schwab v. Schwab*:  "In the absence of a stipulation as to the value of marital assets, the parties must 'produce hard evidence as to those values other than their own personal opinions.'"  *Id.* at 755 (quoting Studt v. Studt, 443 NW2d 639, 641 (SD 1989)).  Because the parties did not stipulate to the value of the horse business,

Rick argues that Joni had to produce "hard evidence" to establish the value of the horse business other than her personal opinion.

[¶19.]     The term "hard evidence" was taken from *Hanks v. Hanks*, a divorce case where both the husband and wife offered their personal opinions as to the value of the marital home and the husband's law practice. 296 NW2d 523, 526 (SD 1980). In affirming the trial court's valuation of these marital assets, this Court made the following comment:

> Where the parties come into the trial court without even a stipulation as to the values, ***then they had better be prepared to produce hard evidence as to those values other than their own personal opinions***. Based upon the lack of such evidence in this record, we are not going to say that the trial court was in error in the valuations that it set. "Exactitude is not required of the trial court in the valuation of assets in a dissolution proceeding; it is only necessary that the value arrived at lies within a reasonable range of figures." Johnson v. Johnson, 277 NW2d 208, 211 (Minn 1979).

*Id*. (emphasis added). In *Martin v. Martin* we again considered the trial court's valuation of marital assets and offered the following explanation of the "hard evidence" language in *Hanks*:

> As we held in *Hanks v. Hanks*, 296 NW2d 523 (SD 1980), it is the obligation of the parties to provide the trial court some competent evidence in addition to their own personal testimony regarding the value of their property. The trial court should not be expected to go on a treasure hunt of its own to try to ferret out evidence that it is the parties' duty to provide.

358 NW2d 793, 798 (SD 1984). Later, in *Studt v. Studt*, we said "*the parties must 'produce hard evidence* as to those values other than their own personal opinions.'" 443 NW2d at 641 (quoting *Hanks*, 296 NW2d at 526) (emphasis added). The origin of the "hard evidence" language indicates that *Studt* and *Schwab* should not be read to require the trial court to reject proposed valuations of marital assets simply

because they are based on a party's personal opinion. This language more accurately serves as a reminder that it is the duty of the parties, not the trial court, to produce competent evidence regarding the value of their property. *Martin*, 358 NW2d at 798. Therefore, we move to the trial court's valuation of Joni's horse business.

[¶20.] While the parties have the task of producing evidence regarding the value of their property, the trial court, as the trier of fact, has the task of placing a valuation on the marital assets. In doing so, "the trial court is not required to accept either party's proposed valuation." Christians v. Christians, 2001 SD 142, ¶12, 637 NW2d 377, 380 (citing Johnson v. Johnson, 471 NW2d 156, 162 (SD 1991) (stating that "[t]he trier of fact is free to accept all of, part of, or none of the expert's opinion.")) (additional citations omitted). However, the value the trial court places upon the marital assets must be within a reasonable range of values presented to the court. *Id.*

[¶21.] Joni testified at length in regard to her involvement in the horse industry over twenty years of owning, breeding, training, and selling horses. She described in detail the horses purchased, sold, deceased or foaled before and after the marriage. In her opinion, she valued her marital share of the horses including the foaled horses at $11,650.00 and her premarital share at $137,900.00. In contrast, Rick's expert observed the horses once, over a year before trial. The expert valued the horses purchased prior to the marriage at $93,900.00, those purchased after the marriage at $38,850.00 and those foaled during their marriage at $78,250.00. Rejecting Joni's request to exclude all the premarital horses in the

marital estate, the trial court included a premarital amount of $57,900.00. The trial court set the value of the horses acquired while married at $28,250.00, which was lower than Rick's value of $38,850.00 but higher than Joni's value of $11,650.00. Likewise, the $55,250.00 value of the horses foaled while married was set lower than Rick's value and higher than Joni's since she had included them in the $11,650.00 figure. Accordingly, the trial court's valuation fell within the range of values presented to the court. Therefore, we cannot say that the trial court's valuation was clearly erroneous.

*3. Appellate Attorney Fees*

[¶22.]     Rick and Joni both filed motions for appellate attorney fees accompanied by itemized statements of expenses. "To determine whether attorney fees are proper in domestic relation cases, we consider, 'the property owned by each party, the relative incomes, the liquidity of the assets and whether either party unreasonably increased the time spent on the case.'" Dejong v. Dejong, 2003 SD 77, ¶30, 666 NW2d 464, 471 (quoting Peterson v. Peterson, 434 NW2d 732, 738 (SD 1989)) (additional citations omitted). Considering these factors under the facts of this case, we determine that each party shall be responsible for their own attorney fees.

[¶23.]     Affirmed.

[¶24.]     GILBERTSON, Chief Justice, and SABERS, KONENKAMP and ZINTER, Justices, concur.