*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STACEY LYNN CAMMENGA, also known as
STACEY LYNN TIMMER,

        Plaintiff/Counterdefendant-
        Appellee/Cross-Appellant,

v

MICHAEL PHILIP CAMMENGA,

        Defendant/Counterplaintiff-
        Appellant/Cross-Appellee.

UNPUBLISHED
March 23, 2023

No.  358463
Barry Circuit Court
LC No.  2020-000233-DO

Before:  M. J. KELLY, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

In this divorce action, defendant, Michael Cammenga, appeals the divorce judgment as of right, and plaintiff, Stacey Cammenga, has filed a cross-appeal.  For the reasons explained in this opinion, we affirm in part, vacate in part, and remand for further proceedings.

## I.  BASIC FACTS

The parties married in October 1992 and have two adult children.  During the marriage, Michael worked at various jobs in the paper industry.  The parties lived in several states during the marriage, and Michael sometimes lived separately from Stacey and the children.  Michael was the primary breadwinner, whereas Stacey was primarily responsible for the home and childrearing.  In 2018, Michael started a business, Cammenga Investments, LLC, which he used—in partnership with other entities that he had an interest in—to purchase a papermill.  In March 2020, after discovering that Michael was having an affair with an employee of the papermill, Stacey filed a complaint for divorce.  Michael filed a counterclaim for divorce.

The divorce was contentiously litigated.  Relevant to the issues raised on appeal, the trial court entered a status quo order that limited the parties' spending to their past practices and prohibited Michael from spending money on the woman identified as his mistress.  Both parties presented evidence indicating that the other had violated the status quo order, and the trial court

eventually determined that their spending in violation of the order resulted in a "wash" so there was no need to credit either party for the other's improper spending. There was also extensive pretrial litigation related to Michael's untimely and incomplete responses to discovery requests. The court ultimately sanctioned Michael by prohibiting the use of documentation that he had not provided to Stacey. Additionally, after the court ordered Michael to pay temporary spousal support, he moved to modify the amount owed based on a purported decrease in his monthly income from $10,000 to $2,500. The trial court denied his request after determining that Michael lied about the decrease in his income.

Following a three-day bench trial, the court placed detailed findings on the record addressing numerous issues related to the parties' assets, the division of the martial estate, spousal support, and Stacey's requests for attorney fees. Thereafter, in response to motions for reconsideration and clarification, the court placed additional findings on the record. This appeal and cross appeal follow.

## II. CREDIBILITY

### A. STANDARD OF REVIEW

Michael argues that the trial court improperly prejudged his credibility during the discovery proceedings. We review a trial court's factual findings for clear error. *Hodge v Parks*, 303 Mich App 552, 554-555; 844 NW2d 189 (2014). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made." *Id.* at 555 (quotation marks and citation omitted). "Special deference is afforded to a trial court's factual findings that are based on witness credibility." *Id.*

### B. ANALYSIS

Michael claims that, during the discovery process, there was no legitimate basis upon which the trial court could assess his credibility. The record belies his assertion.

The discovery proceedings were lengthy, spanning multiple hearings over several months. Although there were various issues, the most significant issues involved Stacey's requests for business documents. She first moved to compel discovery in August 2020, which the trial court granted. When Michael still did not provide the materials, Stacey sought to enforce the discovery order. The court—after viewing information that had been provided by Michael—concluded that Michael had provided irrelevant documents, but had not provided necessary information about his income and the business. Despite Michael's failure to comply with discovery, the court did not sanction him. Instead, the court ordered Stacey to hire an accountant to help her determine what information she needed. The court ordered Michael to produce that information within seven days after the accountant identified it.

Stacey hired an accountant and provided a detailed list of the information needed, which Michael did not provide within seven days. Michael maintained that he could not produce documents because they were in the possession of third parties and that, in any event, producing the materials would be unduly expensive. He claimed that there was no point in producing documents related to the value of the business because the business was a "dumpster fire" with no

value whatsoever. Thereafter, Michael moved for a protective order, and Stacey filed a countermotion to compel discovery.

The court again reviewed information provided by Michael. That information included empty electronic folders, Michael's assertions that he lacked the information, financial statements that appeared to have been prepared by Michael's alleged mistress, and instructions for Stacey to direct her inquiries to other entities. Additionally, Michael claimed that Stacey did not need the information because documents had been given to *his* expert and she had been given "unfettered" access to this expert. (He later admitted that the access was not, in fact, unfettered). Although the court expressed concern that Michael was "playing fast and loose with the rules" by not providing information necessary for Stacey to determine the value of the business, the court gave him additional time to get his "ducks in a row."

At a subsequent hearing, the court noted that Michael sent the court a large box of "what appears to be discovery," which Michael explained he was offering as an exhibit to demonstrate his good faith effort to comply with discovery. Michael did not ask to testify or present any other evidence. His lawyer reiterated Michael's position that he could not provide Stacey with third-party discovery, that she did not need this information because the business was a "dumpster fire," and that it would be a waste of money to generate documents to determine the business's value. In response, Stacey again identified the materials that she had not received and explained why they were necessary for her evaluation of Michael's income and the value of the business.

Ultimately, after eight months of Michael not providing Stacey with the requested information, the trial court held that Michael did *not* have to produce any "third-party" information, but that he would not be able to use any third-party information at trial that was not provided to Stacey by April 16, 2021. See MCR 2.313(B)(2)(b). Michael did not object.

On this record, Michael's complaints about the trial court's discovery determinations and his claim that the court formed unfairly negative opinions about him or treated him harshly during discovery are spurious. The court showed considerable patience and forbearance in the face of Michael's repeated failure to comply with discovery. Indeed, the court's discovery sanction was eminently fair. Moreover, to the extent that the trial court found that Michael failed to provide the information Stacey sought, the trial court was presented with materials from *both* parties to review in assessing Michael's compliance with discovery. Michael did not seek to testify, and he has not shown that the trial court clearly erred by concluding that he had not complied with discovery.

Nevertheless, Michael contends that the court's pretrial discovery rulings resulted in a "prejudgment" of the case, such that the subsequent trial proceedings were tainted. However, "[o]pinions formed by a judge on the basis of facts introduced or events occurring during the course of the current proceedings, or of prior proceedings, do not constitute bias or partiality unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Schellenberg v Rochester Mich Lodge No 2225, of Benevolent & Protective Order of Elks of USA*, 228 Mich App 20, 39; 577 NW2d 163 (1998). Nothing in the trial court's statements or discovery rulings evinces a deep-seated favoritism or antagonism that would make fair judgment at trial impossible.

Moreover, to the extent that, following trial, the trial court concluded that Michael had misrepresented the facts by asserting that he was a "little" person with no access to documents, this finding was supported by the record, which showed that, through his corporations, Michael owned 25% of the LLC that owned the papermill, that he worked at the papermill, and that he was intimately involved in the business's dealings. Further, insofar as the trial court considered Michael's conduct during discovery as a factor when valuing the business and dividing assets, this was not improper. See *Draggoo v Draggoo*, 223 Mich App 415, 430; 566 NW2d 642 (1997) ("Defendant's refusal to answer the interrogatories or supply bank documents could be considered as a relevant factor in determining an equitable division of property because it was tantamount to an attempt to conceal assets.") In sum, Michael's complaints regarding the discovery proceedings as an improper "prejudgment" of the case are without merit.

## III.  TEMPORARY SPOUSAL-SUPPORT

Next, Michael argues that the trial court abused its discretion and denied him due process by preventing him from presenting expert testimony at a temporary spousal-support hearing. We disagree.

In domestic relations actions, a temporary spousal-support order may be entered at any time during the pendency of case. MCL 552.13(1). Such an order may also be "modified at any time during the pendency of the case, following a hearing and upon a showing of good cause." MCR 3.207(C)(3). Here, the court entered a temporary spousal-support award requiring Michael to pay $3,739 in monthly spousal support. Michael moved to modify that order.

The court conducted an evidentiary hearing on the motion. Michael testified at length that, as of February 2021, his monthly income had been reduced from $10,000 to $2,500. He explained that the $2,500 was being paid by a customer called Selig Sealing Products, Inc., and that it was his sole source of income. Stacey, however, presented testimony and evidence regarding an application at a credit union, which Michael completed in March 2021. The loan officer testified that Michael represented that he earned $15,000 each month, that his employer was Cammenga Investments, and that his income was not likely to decline. Given the discrepancy between his testimony and his representations to the loan officer, the court found that Michael had lied about his income. As a result, the court denied the motion to modify spousal support. Considering the record, we conclude that the court did not clearly err by determining that Michael lied about his income being reduced to $2,500.

Michael, however, argues that the court erred by preventing him from presenting testimony from an accountant who was going to testify about Michael's tax forms. The expert testimony regarding tax forms for the 2018 and 2019 tax years appears irrelevant and a needless waste of time given Michael's misrepresentation about his income in 2021, which was the time frame at issue. See MRE 402; MRE 403. The court did not abuse its discretion by excluding the accountant's testimony. See *Nahshal v Fremont Ins Co*, 324 Mich App 709, 710; 922 NW2d 662 (2018) (stating that a trial court's decision to exclude evidence is reviewed for an abuse of discretion).

## IV. ADMISSION OF TEXT MESSAGES

Michael next argues that the trial court abused its discretion by admitting his text messages to his mistress evincing their affair. According to Michael, the messages should have been excluded because Stacey obtained them from his cell phone in violation of MCL 752.795. Under MCL 752.795, it is a felony for a person to access a computer program, system, or network to acquire property if the person was acting "intentionally and without authorization or by exceeding valid authorization." Here, the testimony shows that while Michael was sleeping, Stacey entered the password for his cell phone, accessed his text messages, and recorded several messages so that she could view them at her leisure. Although there is evidence suggesting that the password on the device was to prevent Michael's employees, not his family from accessing his phone, Stacey's furtive actions when accessing the device suggest that she was aware that she lacked authorization to access the text messages stored on his phone. Yet, assuming *arguendo* that the trial court abused its discretion by admitting the text messages, we conclude that reversal is not warranted.

The text messages were one piece of evidence supporting that Michael had an affair with his mistress. The other evidence of his affair included the photos of Michael and his mistress that he inadvertently uploaded to the family's iCloud account, including photos of his mistress in her underwear. There was also testimony about the thousands of dollars Michael had recently begun spending on libido and sex enhancers, his post-it note about "hot love" "last night," testimony from the parties' daughter about her observations of Michael and his mistress whispering together at the papermill, the fact that Michael had moved in with his mistress, and the e-mail to a realtor supporting that Michael and his mistress were buying a house together and putting it in the mistress's name to conceal the purchase. In short, the evidence of an affair was substantial, and even assuming some error in the admission of the text messages, exclusion of the messages would not have affected the outcome of the proceedings. See MCR 2.613(A). Michael is not entitled to relief on this basis.

## V. PROPERTY DIVISION

## A. STANDARD OF REVIEW

Both parties raise numerous challenges to the property award.

> In deciding issues on appeal involving division of marital property, this Court first reviews the trial court's findings of fact. Findings of fact, such as a trial court's valuations of particular marital assets, will not be reversed unless clearly erroneous. . . . If the trial court's findings of fact are upheld, this Court must decide whether the dispositive ruling was fair and equitable in light of those facts. The dispositional ruling is discretionary and will be affirmed unless this Court is left with a firm conviction that the division was inequitable. [See *Butler v Simmons-Butler*, 308 Mich App 195, 207-208; 863 NW2d 677 (2014) (citations omitted).]

## B. ANALYSIS

### 1. MICHAEL'S CHALLENGES TO THE PROPERTY DISTRIBUTION

"The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Berger v Berger*, 277 Mich App 700, 716-717; 747 NW2d 336 (2008). "Each spouse need not receive a mathematically equal share, but significant departures from congruence must be explained clearly by the court." *Byington v Byington*, 224 Mich App 103, 114; 568 NW2d 141 (1997). When addressing the distribution of marital property, the court should consider:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. There may even be additional factors that are relevant to a particular case. For example, the court may choose to consider the interruption of the personal career or education of either party. The determination of relevant factors will vary depending on the facts and circumstances of the case. [*Cassidy v Cassidy*, 318 Mich App 463, 477; 899 NW2d 65 (2017) (quotation marks and citation omitted).]

"The trial court must consider all relevant factors but not assign disproportionate weight to any one circumstance." *Id*. (quotation marks and citation omitted).

Michael first contends that the court erred because it discussed property valuation and the division of assets *before* reviewing the enumerated factors relevant to the property distribution. We disagree. The court is not required to make its findings in any particular order. Instead, the court is required to consider the relevant factors, *Cassidy*, 318 Mich App at 477, and to set forth its findings of fact and law, see MCR 2.517(A)(1) through (3). The court fulfilled these obligations in this case.

Indeed, the court made detailed finding of fact to support its determination that a 60/40 division of the marital property, favoring Stacey, was warranted. The court found that the parties' marriage was a long-term marriage of over 28 years, in which both parties contributed to the marital estate. Michael primarily contributed financially, while Stacey primarily cared for the home and the children. Although Michael worked outside the home, his contribution to the estate had not been entirely positive because he had lost marital assets in his business ventures. The parties were middle-aged and able to work. Stacey's lack of work history limited her opportunities. Michael had some health issues, but they did not prevent him from working. The court found that Michael and his affair were at fault for the breakdown of the marriage, but the court did not treat this as a significant fact in the distribution of assets. Instead, in concluding that a 60/40 division was warranted, the court emphasized Michael's lack of credibility regarding his assets and income and his obstructionist behavior during the court proceedings.

As it relates to the court's factual findings, Michael contends that the court afforded too much weight to his fault. The fault at issue in this case is twofold: Michael's fault in engaging in an extramarital affair that contributed to the breakdown of the marriage and Michael's misconduct

related to the parties' assets. "Marital misconduct is only one factor among many and should not be dispositive." *Cassidy*, 318 Mich App at 478 (quotation marks and citation omitted). "Fault is not a punitive basis for an inequitable division." *Id*. (quotation marks and citation omitted). "Instead, fault should be considered in conjunction with all the other relevant factors." *Id*. (quotation marks and citation omitted). Although misconduct related to assets does not require automatic forfeiture of those assets, attempts to conceal assets, or behavior that results in unnecessary litigation, can be considered when dividing assets and can support a deviation from an equal split. *Draggoo*, 223 Mich App at 430.

The trial court gave some weight to Michael's extramarital affair, but its overall focus was on Michael's misconduct relative to the parties' assets and the divorce proceedings. The court detailed Michael's obstructionist behavior at length—including both his behavior during discovery and his numerous lies during the course of these proceedings—which interfered with Stacey's efforts to value the business, hindered efforts to determine his income, and stymied the court's ability to accurately value assets. On this record, the trial court did not err by considering Michael's misconduct as a significant factor warranting a 60/40 distribution of the marital estate.

Moreover, although Michael's misconduct was a significant factor in the trial court's analysis, it was not the only factor considered. As noted above, the court considered many of the factors, including the parties' age, the length of the marriage, their earning abilities, their health, and their contributions to the marital estate. Considering the trial court's analysis as a whole, the 60/40 division of assets appears to be a fair and equitable on the facts of this case.

Michael briefly argues that the division was inequitable because he received few liquid assets and the business which the court found was worth $0. Although Michael complains about a lack of liquidity, the court's findings make clear that Michael has greater earning capabilities than Stacey and a house in which to live with his mistress which lessens his need for liquid assets. Further, Michael's argument ignores the liquid assets that he received before trial as well as the assets that he received as the beneficiary of the estate of David Hendrickson.[1] Although the court correctly treated the inheritance as separate property, see *Dart v Dart*, 460 Mich 573, 585; 597 NW2d 82 (1999), the fact remains that, contrary to his complaints about liquidity, Michael has liquid assets at his disposal.

Next, with regard to the business, the court valued it at $0, meaning that it did not affect the overall liquidity or value of Michael's property award one way or the other. Moreover, although the court valued the business at $0, Michael testified that the papermill is in the process of building back to full strength. Thus, it is an asset with a potential for additional value and income. See *Hodge*, 303 Mich App at 564 (noting that the husband's business, awarded to him as an asset, "although currently of minimal value, has the potential to improve as economic conditions change"). Michael's general arguments regarding the equity and liquidity of the award, therefore, lack merit.

---

[1] Prior to his death, Hendrickson was a friend who loaned the parties approximately $76,000 during their marriage.

Next, Michael contends that a tax loss carryforward is not an asset and that it should not have been divided as part of the marital estate. In contrast, Stacey asserts that the court correctly identified the carryforward as a marital asset but that it clearly erred by assigning the asset to Michael's without valuing the carryforward. We agree that the tax loss carryforward is a marital asset and that the trial court erred by awarding it to Michael without first determining its value.

"Generally, assets earned by a spouse during the marriage, whether they are received during the existence of the marriage or after the judgment of divorce, are properly considered part of the marital estate." *Woodington v Shokoohi*, 288 Mich App 352, 364; 792 NW2d 63 (2010). Tax benefits—such as the right to a tax refund—may be divided as marital assets. See *Burkey v Burkey*, 189 Mich App 72, 75; 471 NW2d 631 (1991). Several courts to consider the issue have also concluded that tax loss carryforwards, which involve the right to offset future earnings with losses, can constitute marital property subject to division when the losses to be carried forward were incurred during the marriage. See 1 Equitable Distribution of Property, 4th, § 5:9 & n 16 (compiling cases). Here, during the marriage, Michael used marital assets to purchase the business, and he incurred significant business losses—apparently totaling more than $2 million— that he may use to offset taxes on future income. Thus, the trial court did not err by determining that the tax loss carryforward is a marital asset.

Once a determination has been made that an item constitutes marital property, a trial court is required to make specific findings regarding the value of that property "if the value is in dispute." *Olson v Olson*, 256 Mich App 619, 627; 671 NW2d 64 (2003). It is clear error for a court to simply award an asset with a disputed value to one party without first placing a value on the disputed piece of marital property. *Id*. At trial, Stacey presented expert testimony from a certified public accountant to support that Michael's tax documents evince a more than $2 million carryforward. The accountant testified that the carryforward will continue until it is used completely and that it may be used to offset ordinary income as well as things like capital gains. As a result, Michael will effectively be able to earn $2 million without paying any taxes on those earnings. The carryforward is nontransferable, so Michael could not assign a portion to Stacey for use on her own taxes. Nevertheless, the accountant testified that the value of the carryforward could be determined by calculating Michael's taxes each year and to ascertain how much he saved as a result of the carryforward. This would involve looking at Michael's income, determining his tax bracket and any deductions first, and then calculating the tax that he would owe but for the carryforward. Michael did not present any evidence as to the value or lack thereof of the tax loss carryforward.

Based on the accountant's testimony, a portion of the tax loss carryforward's value could be allocated to Stacey by ordering Michael to annually pay Stacey an amount equal to 60% of his tax savings attributable to the carryforward. That is a permissible way to divide an asset. There is no prohibition on the trial court entering orders that will require future disclosures by the parties. See, e.g., *Hodge*, 303 Mich App at 562 (approving a 2011 property division that, among other things, required the husband to "thereafter submit his personal and business income tax returns in 2012, 2013, and 2014 to show whether the business improves"). The trial court rejected this approach because it posed the risk of the parties being "in litigation forever." The court's concern for future litigation is understandable. But the court's reluctance to preside over anticipated future litigation does not provide a basis for awarding the asset solely to Michael without placing a value on it. Because the trial court clearly erred by awarding the carryforward to Michael without

determining the value of the asset, we vacate the court's conclusions regarding the carryforward and remand for further proceedings. On remand, the trial court shall, on the existing record, determine the value of the carryforward and readjust the property division to compensate Stacey accordingly.[2]

Michael also argues that the trial court clearly erred by valuing the notes in the Entrust account at $362,500 when, according to Michael, the notes are worthless. We disagree. Although Michael contends that the notes are worthless because they are backed by the papermill's earnings, and the papermill is in turn worthless, the only evidence Michael offered to support his assertions regarding the terms of the notes was his own testimony. The court was not required to and, in fact, did not find his testimony credible. See *Hodge*, 303 Mich App at 555. Moreover, the court's valuation determination is supported by the record. With regard to the Entrust account, the statement for the account admitted at trial indicated that it has a total "market value" of $377,813.44. This amount consists of $15,313.44 in cash, and $362,500 in "notes" related to "Columbia OPSCo, LLC," which is one of the partner companies in Michael's business. The chief financial officer for Entrust testified that Michael withdrew $362,500 in actual cash from the account. Further, Michael conceded that he gave money to Columbia in exchange for the promissory notes. Thus, the record provided evidence that there is an outstanding debt in the amount of $362,500 owed to the marital estate. The court did not err by valuing this asset on the basis of the amount owed to the marital estate and dividing this asset as part of the marital estate. See 2 Equitable Distribution of Property, 4th, § 6:100 & n 2 ("Debts receivable are acquired in exchange for the funds or property transferred to the debtor, and they are normally given the same classification.").

Next, Michael argues that the court erred by assigning the debt associated with his personal guaranties solely to him without first valuing them. The court addressed Michael's personal guaranties in connection with the business, concluding that the best estimate for everything—on the basis of Michael's accountant's testimony—was to value the business at zero while also giving Michael zero credit for any liabilities that he may have related to the business. In reaching this conclusion, the court relied on Michael's accountant's testimony that the business had a value of $0. In contrast, the trial court emphasized that evidence also showed that the business was hiring new employees and had offered Michael a position with a $128,000 salary, which were activities

---

[2] Michael argues that the court's failure to value the carryforward in the context of the property division is of no importance because the court considered the carryforward when calculating spousal support. This argument lacks merit. The carryforward is an asset, and as such, must be valued by the trial court as part of the property division. See *Olson*, 256 Mich App at 627-628. Without a value—or another means for determining the carryforward's equitable distribution between the parties—it is impossible to determine the equity of the property division or the equity of the spousal-support award. See *Seifeddine v Jaber*, 327 Mich App 514, 523-524; 934 NW2d 64 (2019) ("[T]he property awarded to the parties is a factor that should be considered when deciding whether to award spousal support."). Michael's claim that spousal support somehow obviates the need to value an asset is without merit.

that Michael's accountant testified were contrary to the condition of the business at the time he valued it. That suggested a potential change of circumstance and an improvement in the business. In bundling the personal guaranties with the business, the court noted that these personal guaranties were not among the "debts" that Michael claimed on his Verified Financial Statement. The court also again emphasized Michael's obstructionist behavior, and that of his business partners, in attempting to thwart Stacey's discovery requests. Further, the court also addressed the various loan arrangements in this case as a "tangled web of business garbage." With limited information about the business, and given the loan arrangements, the trial court ultimately awarded the business and related liabilities to Michael at a $0 value. On this record, given the lack of information regarding the particulars of the business, we conclude that the trial court did not clearly err by assigning Michael's personal guaranties to him," and awarding the business and associated debts to him with a net value of $0 and no credit for the potential liability on the personal guaranties.

Moreover, a guaranty is "an independent collateral agreement" by which the guarantor "undertakes to pay the obligation if the primary payor fails to do so." *Bandit Indus, Inc v Hobbs Intern, Inc*, 463 Mich 504, 508 n 4; 620 NW2d 531 (2001) (quotation marks and citation omitted). The contingent nature of a guaranty is notable in the context of a divorce and the division of liabilities because a liability that is merely speculative or hypothetical need not necessarily be divided or assigned value when dividing the marital estate. See, e.g., *Hanaway v Hanaway*, 208 Mich App 278, 301 & n 13; 527 NW2d 792 (1995) (concluding that the trial court did not err by valuing stock without considering possible tax consequences when no sale or other taxable event was planned or contemplated). In the context of guaranties, a speculative possibility of liability associated with a guaranty should not be considered; rather, there must be a showing that there is a "quantifiable likelihood of liability" before guaranties can be divided in a divorce. See 2 Equitable Distribution of Property, 4th, § 6:98 & n 12. See, e.g., *Larson v Larson*, 733 NW2d 272, 275-276 (SD, 2007) (concluding that the trial court did not abuse its discretion by failing to deduct the husband's personal guaranties from his total asset award when liability under them was contingent and speculative).

Michael has evaded efforts to value the business and to accurately determine its assets and liabilities. As a result, the record provides no basis on which to assess the likelihood that the business will default on the underlying loans and to conclude that there is a quantifiable likelihood that defendant will become liable for the guaranties. In other words, without more information about the business, which Michael chose not to provide, it cannot be concluded that the business is substantially likely to default on the underlying loans or that Michael will likely become liable as the guarantor. Therefore, on this record, the court did not abuse its discretion by bundling the guaranties with the business and awarding the business to Michael with $0 value and $0 liabilities.

Next, Michael argues that the trial court erred by treating the $76,000 the parties owed to the Hendrickson Estate as a separate debt and holding him solely responsible on the basis that Michael, as the executor of Hendrickson's estate, was empowered by Hendrickson's will to forgive debts. Michael asserts that he owes a fiduciary duty and that he cannot simply forgive the debt. He maintains that the debt should be considered a marital debt and divided accordingly.

A trial court may find reasons to conclude that debt incurred during the marriage is an individual debt. *Reed v Reed*, 265 Mich App 131, 157; 693 NW2d 825 (2005). However, that is not what the court did in this case. Both parties testified that, during their marriage, they borrowed

$76,000 from Hendrickson. When dividing the parties' debts and assets, the trial court apportioned the debt to Michael, noting that Michael had the power under Hendrickson's will, as the executor of the estate, to forgive debts. After recognizing Michael's power to forgive the debt, the court stated:

> So, I'm being asked, well, half that—half that debt, make her pay part of it, and I'll pay part of it. Well, you just happen to leave out that you have the power to forgive your part of that debt. So, you get that entire debt. That $76,000 debt is on your side of the marker. Because you have the authority under the will that you signed on behalf of [Hendrickson] to forgive that debt entirely. And you just kind of left that out in your testimony along with the life insurance. And if you really feel like his kids need that $76,000, then I suppose you could pay it out of the life insurance proceeds that you received or out of the IRA that you received. But since you have the ability to forgive that debt, you get the debt.

The court later clarified its ruling as follows:

> Then there's the 76,000 owed to [Hendrickson's estate]. That is *apportioned* to [Michael].
>
> And in clarification of the previous statements, I did not indicate that [Michael] shouldn't pay it. I said he has the ability under the terms of the will to forgive it. What I do not—what—*what will not happen under the terms of the judgment is he can forgive his half, and she's responsible for her half.* No. So, he has that entire amount. He can—he can pay it back with the IRA he got from the estate. He can pay it back with the insurance proceeds he got from the estate. Or he can choose to pay it back some other way. Or he can choose not to pay it back, as he has the ability to forgive it. That's what I said. I didn't say he shouldn't pay it. I said he has the ability to not pay it because of that clause in the will. [Emphasis added.]

Considering the trial court's analysis of the Hendrickson's debt as a whole, particularly its clarifications, the trial court treated the Hendrickson debt as a marital debt and apportioned it to Michael in the property division for practical reasons. Indeed, the court's reference to Stacey's "half," makes clear that this debt was treated as a marital debt and divided as part of the marital estate. Because Michael already received the relief requested, he is not entitled to further relief on appeal.

## 2. STACEY'S CHALLENGES TO THE PROPERTY DISTRIBUTION

Stacey argues that the trial court erred by using her spending while the status quo order was in place to offset Michael's dissipation of assets during the same timeframe. Stacey maintains that Michael was the only one who engaged in dissipation of marital assets and that the court erred by failing to take punitive measure against him to compensate her for the dissipated assets.

In a divorce action, "when a party has dissipated marital assets without the fault of the other spouse, the value of the dissipated assets may be included in the marital estate." *Woodington*, 288 Mich App at 368. Spending of marital assets on a mistress dissipates the marital estate. See

*Cassidy*, 318 Mich App at 468, 499-500 (indicating that the martial estate was dissipated by the husband using marital funds to assist his mistress in purchasing a home). Fraudulent transfers to third parties, including children, can also provide a basis for recapturing an asset for distribution as part of the marital estate, when the transfer was made to deprive the other spouse of an interest in marital property. See *Thames v Thames*, 191 Mich App 299, 302; 477 NW2d 496 (1991). In addition, a court might specifically enter an order prohibiting certain actions regarding property during the pendency of the divorce case, and property transfers in violation of such an order are invalid and may be set aside. See *Webb v Webb*, 375 Mich 624, 627; 134 NW2d 673 (1965).

The trial court found that Michael engaged in dissipation of marital assets. See *Cassidy*, 318 Mich App at 499-500. The court found that Michael purchased a home with his mistress, which they placed in her name even though they were buying it together. The court specifically rejected Michael's claim that he was simply a tenant paying "rent" to a landlord. Stacey also presented evidence that Michael spent marital funds improving his new house with his mistress, "wining and dining" his mistress, buying supplements to enhance their sex life, and taking trips with his mistress. The trial court credited Stacey's evidence and concluded that Michael had improperly spent $22,735 on his mistress. Given the evidence presented, the court did not clearly err by concluding that Michael had engaged in improper spending, i.e., dissipation of marital assets.

The trial court's findings also support that Michael's improper spending constituted a violation of the status quo order. That order, which was amended once, limited the parties' spending to their past practices and it prohibited Michael from spending money on his mistress. It also contained provisions requiring Michael to continue to deposit his income and expense reimbursements into the marital accounts. Thus, by continuing to spend funds on his mistress, and by failing to deposit funds in marital accounts, Michael dissipated marital assets and he violated the status quo order. These funds should have been recaptured for the marital estate.

Instead of recapturing the dissipated assets and undeposited income for the marital estate, the trial court "offset" Michael's dissipation of assets with Stacey's spending during the pendency of the divorce, which included her spending on the parties' adult children as well as other expenditures. Specifically, at trial, Michael sought to recapture $72,927 in allegedly inappropriate spending by Stacey. Addressing Michael's request, the court first held that his request for repayment of money spent on a computer was addressed in the property settlement and that he would be reimbursed for expenses related to Stacey's hiring of a private investigator. Additionally, Stacey conceded that Michael should be credited for the $1,500 she spent on a wedding venue for the parties' daughter, which was an unusual expense for which Michael did not consent.

The trial court, however, did not make any findings as to whether the other allegedly improper expenses were, in fact, improper expenses. In particular, with regard to Stacey's spending, Stacey and the parties' children testified that her spending on the children pending the divorce was consistent with past practices. Stacey also testified that her spending on family members—such as her parents, brother, nieces and nephews, and friends—was consistent with past practices. Michael offered no evidence that plaintiff's spending on their daughter—or other family members and friends—differed from the couple's past practices. With regard to spending on the parties' son, however, Stacey acknowledged that she spent over $33,000 supporting him. Stacey and the children testified that this spending was consistent with past practices. Michael

-12-

acknowledge that the parties had provided support for their adult child before the divorce. He maintained, however, that, during the pendency of the divorce, Stacey spent more on their son than they had in past years and that, in any event, the parties should no longer support him because he smoked marijuana and stopped attending college. Michael also maintained that their son should be able to support himself. The trial court did not resolve this factual dispute.

Among Michael's other claims of improper spending, the trial court also failed to address the $15,000 Stacey gave to the parties' son, before entry of the status quo order, which Stacey testified was a repayment of money that she and Michael took from the child's bank account in 2017. Repayment of a marital debt does not constitute dissipation. See *Elahham v Al-Jabban*, 319 Mich App 112, 124; 899 NW2d 768 (2017) (concluding that a loan repayment did not constitute dissipation of marital assets). Stacey also testified that a payment to her mother was a repayment of money that Stacey borrowed from her parents during the pendency of the divorce case when Michael emptied their account, leaving her with no money to pay bills. If Stacey's testimony is credited, this would not constitute dissipation of assets. See *Hanaway*, 208 Mich App at 299-300 (concluding that the trial court erred by reducing the wife's "share of the assets by $30,613, the amount she spent because defendant refused to pay certain expenses, that should have been paid from marital assets"). Yet, the trial court made no factual findings regarding these amounts to support whether they constituted dissipation of assets or legitimate payment of debts and marital expenses. Other than noting the amount that Stacey spent on a private investigator, the trial court also failed to make factual findings regarding her expenditures on an accounting expert for this case, an estate planner, or a private investigator to support that this spending constituted dissipation or a violation of the status quo order, particularly in light of Stacey's testimony that Michael had also been using marital funds to pay for litigation expenses, such as an attorney.

In sum, apart from the $1,500 wedding debt that Stacey concedes was properly included on her side of the ledger, there are factual questions to be resolved regarding whether Stacey's expenditures constitute a dissipation of marital assets or a violation of the status quo order or both. Accordingly, we remand with instructions that the trial court make factual findings, on the existing record, regarding Stacey's spending to determine whether Stacey dissipated assets or violated the status quo order or both. See *Woodington*, 288 Mich App at 368. If the trial court's fact-finding results in the elimination or reduction of the offset for Stacey's spending, the property award should be adjusted accordingly.

Next, Stacey argues that the trial court's overall distribution of assets did not, mathematically speaking, accord with the trial court's intention to divide the estate 60/40. According to Stacey, she is entitled to an additional $90,000 in assets to accomplish the 60/40 split. Michael concedes that the trial court intended a 60/40 split of assets, but he argues that Stacey's calculations regarding the distribution of assets are incorrect. Both parties provided detailed charts on appeal purporting to summarize the court's distribution of assets and debts with the corresponding values as assigned by the trial court. We conclude that there is no need to address this issue. Remand for further proceedings related to the overall value of the marital estate are required because the trial court clearly erred by failing to place a value on the tax loss carryforward and because the court failed to make adequate factual findings as to whether Stacey dissipated the marital estate, violated the status quo order, or both. Because the court's findings on remand related to both of those issues has the potential to affect the overall value of the marital

-13-

estate, we conclude that any mathematical errors in the court's distribution can be addressed on remand.

## VI. SPOUSAL SUPPORT

### A. STANDARD OF REVIEW

Both parties challenge the trial court's spousal-support award. We review a trial court's spousal-support award for an abuse of discretion. *Woodington*, 288 Mich App at 355.

### B. ANALYSIS

Spousal support is governed by MCL 552.23(1), which provides for a case-by-case approach to a determination of spousal support. See *Loutts v Loutts*, 298 Mich App 21, 29; 826 NW2d 152 (2012). There is no particular formula that governs spousal support. *Id.* at 30. "The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case." *Berger*, 277 Mich App at 726. Factors to be considered when addressing spousal support include:

> (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Id.* at 726-727 (quotation marks and citation omitted).]

"The trial court should make specific factual findings regarding the factors that are relevant to the particular case." *Korth v Korth*, 256 Mich App 286, 289; 662 NW2d 111 (2003).

The trial court concluded that Stacey was entitled to spousal support. Initially, the trial court awarded her $2,426 in monthly spousal support, imputing income to plaintiff in the amount of $20,000 and using $128,000 as Michael's annual income. On reconsideration, the trial court also addressed the tax carryforward, and it reconfigured its calculations to account for the fact Michael's income would essentially be tax free.[3] Considering this fact, the court increased the amount of spousal support to $2,767 each month for 14 years and four months.

---

[3] On appeal, Michael attempts to challenge the testimony regarding the valuation of the tax loss carryforward. We consider these arguments, which Michael failed to raise in the trial court, to be waived. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008).

## 1. MICHAEL'S SPOUSAL-SUPPORT CHALLENGES

Michael argues that the trial court's calculation of spousal support improperly involved the mechanical use of a prognosticator, rather than an assessment of the parties' particular facts and circumstances. Yet, contrary to his contention that the trial court mechanically applied a formula or prognosticator, the record shows that, when addressing spousal support, the trial court considered numerous factors. The trial court noted the long-term length of the marriage, addressed the property awarded to both parties, and their respective abilities to work and their earning capacities. The trial court rejected Michael's claim that his health interfered with his ability to work, and although recognizing Stacey's limited earning capacity given her lack of work history, the trial court imputed income to her in the amount of $20,000 on the basis that she should be able to work full-time and earn minimum wage. The trial court addressed the history of the marriage and the parties' respective contributions, noting Michael's role as "breadwinner" and Stacey's contribution as a "stay-at-home parent." The trial court considered Michael's fault in the breakdown of the marriage, the parties' historical standing of living, the parties' present needs and respective living situations. Further, the trial court addressed equity in general, again noting Michael's delaying tactics in the divorce case and his numerous lies during this case. Thus, on this record, the trial court did not rigidly adhere to any particular formula without consideration of the parties' particular needs and incomes.

Michael complains that the trial court failed to address (1) Stacey's postdivorce needs and (2) his health. The record belies that claim. With regard to Stacey's needs, Michael apparently wants her to live on an incredibly restricted budget, which he maintains she can do by residing with her parents forever. The trial court considered and rejected this view of Stacey's needs, noting that Stacey planned to move out of her parents' home and that she needed spousal support "to provide her the ability to bring her present situation to a livable situation." Thus, the trial court did not fail to consider Stacey's needs. Similarly, the trial court did not fail to address Michael's health. Evidence was offered at trial that Michael has a history of migraines and had surgery in the past for neck problems. However, the evidence was also clear that these problems date back 10 years, and that these issues have not prevented Michael from working during that time. Indeed, historically, after surgeries, Michael was soon back to work and taking vacations. Further, despite his purported health complaints, there is no dispute that Michael is currently working. Consistent with this evidence, the trial court specifically addressed Michael's health concerns as bearing on his ability to work, acknowledging that Michael had a history of health concerns but concluding that these concerns, including surgery, did not prevent him from working. There is, therefore, no merit to Michael's claim that the court did not address his health.

Finally, Michael proclaims, in cursory fashion, that the award is inequitable and will clearly leave him impoverished. He does not, however, direct this Court to any testimony supporting his claim that paying a total of $33,204 annually in modifiable spousal support to Stacey will impoverish him. Rather, in connection with this argument, he only directs this Court to testimony suggesting that Stacey is relatively young and was awarded significant assets, so it is unreasonable to expect that the "vast majority" of her financial support must come from Michael. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham*

*v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, we consider this argument abandoned on appeal.

## 2. STACEY'S SPOUSAL-SUPPORT ARGUMENTS

On cross-appeal, Stacey argues that the trial court failed to appropriately consider her needs and the fact that the amount of spousal support awarded to her will leave her with a budget shortfall each month. As discussed in connection with Michael's arguments, the trial court did not fail to consider Stacey's needs.

Stacey next argues that the trial court clearly erred in its determination that Michael's annual income was $128,000. She asserts that the court should have found that because there was evidence that Michael had previously lied about his income, the court should have found that his income was higher. She does not direct this Court to testimony in the lower court record, however, indicating what specific income should have been found. Michael testified that his annual income was $128,000 and introduced documentation to support that assertion. Although the trial court stated repeatedly that Michael's credibility was "zero," the court was not precluded from finding his testimony regarding his income to be credible. In light of the evidence introduced at the bench trial, we are not left with a definite and firm conviction that the trial court's finding was clearly erroneous.

## 3. IMPACT OF THE TAX LOSS CARRYFORWARD

The trial court's spousal support calculation took into account the impact the tax loss carryforward would have on Michael's income. Based on its determination that Michael would, essentially, not have any tax liability as a result of the carryforward, the court used Michael's gross income when calculating spousal support. Under the circumstances, that decision was "just and reasonable." See *Berger*, 277 Mich App at 726. Yet, because the trial court must assign a value to that tax-loss-carryforward asset and must distribute 60% of the value of that asset to Stacey, the carryforward's impact on the spousal-support calculation will likely be affected. Therefore, on remand, the trial court must consider the impact of its tax-loss-carryforward's valuation determination has on the spousal support calculation.

## VII. ATTORNEY FEES

## A. STANDARD OF REVIEW

Both parties also challenge the trial court's award of attorney fees to Stacey. We review a trial court's decision whether to award attorney fees for an abuse of discretion. *Cassidy*, 318 Mich App at 479.

## B. ANALYSIS

Attorney fees may, however, be awarded under MCR 3.206(D), which states:

(1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

-16-

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

(a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

This court rule provides two independent reasons for a party in a divorce action to obtain attorney fees. *Cassidy*, 318 Mich App at 480. "Whereas MCR 3.206[D](2)(a) allows payment of attorney fees based on one party's inability to pay and the other party's ability to do so, MCR 3.206[D](2)(b) considers only a party's behavior, without reference to the ability to pay." *Id.* at 480-481 (quotation marks and citation omitted). Under either subsection, "[t]he party requesting the attorney fees has the burden of showing facts sufficient to justify the award." *Woodington*, 288 Mich App at 370.

Stacey sought attorney fees under both subsections in MCR 3.206(D)(2). When a party requests need-based attorney fees in a divorce action it is incumbent upon the trial court to determine whether attorney fees are needed for the party to defend his or her suit, including whether, under the circumstances, paying attorney fees would require that party to invade assets needed for support. *Myland v Myland*, 290 Mich App 691, 703; 804 NW2d 124 (2010). The trial court must also consider whether the other party has "the ability to pay or contribute" to those attorney fees. *Id.* Special consideration should be given "to the specific financial situations of the parties and the equities involved." *Id.*

Here, although Stacey specifically sought attorney fees on the basis that she was unable to pay and that Michael was able to pay her attorney fees. The trial court, however, failed to make any of the factual findings necessary for a determination of the propriety of attorney fees under MCR 3.206(D)(2)(a). Without adequate fact-finding, it cannot be determined whether the trial court's decision regarding need-based attorney fees constituted an abuse of discretion. See *Woodington*, 288 Mich App at 371. In these circumstances, we remand to the trial court for consideration, in the first instance, of Stacey's need-based request under MCR 3.206(D)(2)(a). See *Myland*, 290 Mich App at 703.

Next, the parties dispute the trial court's decision to awarded Stacey $20,000 on the basis of Michael obstructive conduct and failure to follow court orders. Given the extensive discovery history in this case and the overall lack of reliable information about Michael's business that has flowed from his obstructionist behavior, the trial court did not clearly err by concluding that Michael's behavior warranted attorney fees under MCR 3.206(D)(2)(b). Michael responded late to discovery requests, withheld information about assets during discovery, lied about his income when seeking to have spousal support modified before trial, and refused to produce information about the business during discovery. Notably, while Michael stonewalled discovery before trial with assertions that he lacked access to "third party" information about the companies, at trial he attempted to authenticate business documents as records kept in the ordinary course of business,

and, as emphasized by the trial court, he was able to produce business information for a valuation review by his expert. Contrary to Michael's arguments, the trial court did not err in its assessment of Michael's credibility regarding his access to documents or by concluding that Michael had engaged in obstructionist behavior during discovery and throughout this case. In light of the record in this case, the trial court did not err by concluding that attorney fees were warranted.

Notwithstanding that the trial court did not err by concluding that Michael's behavior warranted attorney fees, the court clearly erred in setting the amount of attorney fees at $20,000. Attorney fees and expenses are warranted when they were incurred as a result of one party's bad behavior. See MCR 3.206(D)(2)(b). There is, in other words, a causal requirement; the bad behavior must have caused the incurrence of the fees and expenses. See *Richards v Richards*, 310 Mich App 683, 702; 874 NW2d 704 (2015). Moreover, the amount of attorney fees must also be reviewed for reasonableness. See *Cassidy*, 318 Mich App at 488. Here, in setting the amount of attorney fees at $20,000, the trial court admitted that it pulled this number "out of the air." This is not a sufficient basis for justifying a particular amount of attorney fees. Instead, the trial court needed to more particularly evaluate what attorney fees and expenses Stacey incurred as a result of Michael's bad behavior, and before awarding a specific amount of attorney fees, the trial court also needed to assess reasonableness. Given the trial court's failure to make these necessary findings, we vacate the award of attorney fees and remand for further proceedings regarding the amount of attorney fees.

## VIII. REMAND TO DIFFERENT JUDGE

Finally, Michael asserts that the trial judge should be disqualified and the case remanded for proceedings before a different judge. "The general concern when deciding whether to remand to a different trial judge is whether the appearance of justice will be better served if another judge presides over the case." *Bayati v Bayati*, 264 Mich App 595, 602; 691 NW2d 812 (2004). That is, this Court "may remand to a different judge if the original judge would have difficulty in putting aside previously expressed views or findings, if reassignment is advisable to preserve the appearance of justice, and if reassignment will not entail excessive waste or duplication." *Id*. at 602-603. None of these circumstances are present in this case. The judge's findings relative to Michael's credibility were soundly rooted in the evidence, and these types of opinions, formed by a judge on the basis of evidence and events occurring during the course of the current proceedings, are not evidence of bias or partiality. See *Schellenberg*, 228 Mich App at 39. There is also no indication of deep-seated antagonism or favoritism that would suggest that the trial judge cannot put aside previous findings or views as would warrant reassignment to a new judge on remand. See *Bayati*, 264 Mich App at 602. Moreover, in this lengthy and factually detailed case, reassignment would involve unnecessary and excessive waste and duplication. See *id*. Michael's request for a new judge is denied.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We retain jurisdiction. Neither party having prevailed in full, no taxable costs are awarded. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Thomas C. Cameron

# Court of Appeals, State of Michigan

## ORDER

Stacey Lynn Cammenga v Michael Philip Cammenga

Docket No.    358463

LC No.        2020-000233-DO

Michael J. Kelly
Presiding Judge

Kathleen Jansen

Thomas C. Cameron
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.  We retain jurisdiction.

Proceedings on remand in this matter shall commence within 56 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The proceedings on remand are limited to the issues specifically addressed in the opinion issued concurrently with this order.

The parties shall promptly file with this Court a copy of all papers filed on remand.  Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

March 23, 2023
Date

_____
Chief Clerk